## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

KRISTY CEBALLOS,                        )
                                        )
                    Plaintiff,          )
                                        )   CIVIL ACTION
v.                                      )
                                        )   No. 08-4108-JAR-GBC
                                        )
MICHAEL J. ASTRUE,                      )
Commissioner of Social Security,        )
                                        )
                    Defendant.          )
_____ )

### REPORT AND RECOMMENDATION

Plaintiff seeks review of a decision of the Commissioner of Social Security (hereinafter Commissioner) denying supplemental security income (SSI) under sections 1602 and 1614(a)(3)(A) of the Social Security Act.  42 U.S.C. §§ 1381a, and 1382c(a)(3)(A) (hereinafter the Act).  Finding no error as alleged by plaintiff, the court recommends the Commissioner's decision be AFFIRMED.

### I.   Background

Plaintiff applied for SSI on December 8, 2004 alleging disability beginning April 1, 2001.  (R. 14, 105-09).  Her application was denied initially and upon reconsideration, and plaintiff requested a hearing before an Administrative Law Judge (ALJ).  (R. 14, 40, 41, 62).  On September 11, 2007, a hearing at which testimony was taken from plaintiff and from a vocational

expert was held before ALJ Michael Dayton.  (R. 14, 539-62).  At
the hearing, plaintiff was represented by counsel.  (R. 14, 539).
On September 25, 2007, ALJ Dayton issued a decision finding
plaintiff not disabled through that date.  (R. 14-26).

The ALJ found that plaintiff has never engaged in gainful
activity, that she has a combination of impairments which is
"severe" within the meaning of the Act and the regulations, but
that her combination of impairments does not meet or equal the
severity of any impairment listed in the Listing of Impairments.
(R. 16-17).  The ALJ found plaintiff's allegations of symptoms
"not entirely credible," and weighed the medical source opinions
of:  non-treating consultative Psychologist, Dr. Allen; Dr. Lear
and ARNP (Advanced Registered Nurse Practitioner)(hereinafter NP)
Friesen; prison mental health sources; non-examining state agency
Psychologist, Dr. Witt; and the other non-examining state agency
medical consultants.  (R. 23-25).  He found the opinion of the
prison mental health sources of little relevance to plaintiff's
abilities when not incarcerated.  (R. 24).  He gave "substantial
weight" to the opinions of Dr. Allen and Dr. Witt, but not to the
opinions of the state agency consultants who performed the
initial review.  (R. 24-25).  He did not give substantial weight
to Dr. Lear's and NP Friesen's statement.  (R. 24).

Based upon his consideration of the evidence, plaintiff's
allegations, and the medical source opinions, the ALJ determined

plaintiff is able to perform a range of work at all exertional levels, with mental limitations in the abilities to understand, remember, and carry out detailed instructions; and to interact appropriately with the public. (R. 20). He found plaintiff able to do simple, but not detailed work, and would do best with minimal interaction. Id. He found plaintiff does not have past relevant work, but that jobs exist in significant numbers in the economy which plaintiff can perform. (R. 25). Therefore, he found her not disabled, and denied her application. (R. 26).

Plaintiff disagreed and sought, but was denied, Appeals Council review. (R. 5-7, 538). Therefore, the ALJ's decision is the Commissioner's final decision. Id.; Blea v. Barnhart, 466 F.3d 903, 908 (10th Cir. 2006). Plaintiff now seeks review.

## II.  Legal Standard

The court's review is guided by the Act. 42 U.S.C. §§ 405(g), 1383(c)(3). Section 405(g) provides, "The findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." The court must determine whether the factual findings are supported by substantial evidence in the record and whether the ALJ applied the correct legal standard. Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001). Substantial evidence is more than a scintilla, but less than a preponderance, and it is such evidence as a reasonable mind might accept to

-3-

support a conclusion.  Zoltanski v. F.A.A., 372 F.3d 1195, 1200
(10th Cir. 2004); Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir.
1988).  The court may "neither reweigh the evidence nor
substitute [it's] judgment for that of the agency."  White, 287
F.3d at 905 (quoting Casias v. Sec'y of Health & Human Servs.,
933 F.2d 799, 800 (10th Cir. 1991)); Hackett v. Barnhart, 395
F.3d 1168, 1172 (10th Cir. 2005).  The determination of whether
substantial evidence supports the Commissioner's decision,
however, is not simply a quantitative exercise, for evidence is
not substantial if it is overwhelmed by other evidence or if it
constitutes mere conclusion.  Gossett, 862 F.2d at 804-05; Ray v.
Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

An individual is under a disability only if that individual
can establish that she has a physical or mental impairment which
prevents her from engaging in substantial gainful activity and is
expected to result in death or to last for a continuous period of
at least twelve months.  42 U.S.C. § 423(d).  The claimant's
impairments must be of such severity that she is not only unable
to perform her past relevant work, but cannot, considering her
age, education, and work experience, engage in any other
substantial gainful work existing in the national economy.  Id.

The Commissioner uses a five-step sequential process to
evaluate whether a claimant is disabled.  20 C.F.R. § 416.920
(2007); Allen v. Barnhart, 357 F.3d 1140, 1142 (10th Cir. 2004);

-4-

Ray, 865 F.2d at 224.  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity since the alleged onset, whether she has severe impairments, and whether the severity of her impairments meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1).  Id. at 750-51.  If plaintiff's impairments do not meet or equal the severity of a listing, the Commissioner assesses claimant's RFC.  20 C.F.R. § 416.920.  This assessment is used at both step four and step five of the sequential evaluation process.  Id.

After assessing claimant's RFC, the Commissioner evaluates steps four and five--whether the claimant can perform her past relevant work, and whether she is able to perform other work in the economy.  Williams, 844 F.2d at 751.  In steps one through four the burden is on claimant to prove a disability that prevents performance of past relevant work.  Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2.  At step five, the burden shifts to the Commissioner to show other jobs in the national economy within plaintiff's capacity. Id.; Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999).

Plaintiff claims the ALJ erred in several respects in evaluating the opinions of Dr. Lear and NP Friesen.  She claims he erred in finding Dr. Lear and NP Friesen are not "treating sources;" in failing to recontact Dr. Lear and NP Friesen regarding an inconsistency in their medical source statements; and in ignoring certain evidence supportive of Dr. Lear's and NP Friesen's opinions.  Finally, she claims that in any case, the ALJ failed to properly evaluate NP Friesen's opinion in accordance with Social Security Ruling (SSR) 06-3p.  The Commissioner argues that the ALJ properly evaluated the medical source opinions of Dr. Lear and NP Friesen, and that substantial evidence in the record supports the decision to discount those opinions.  The court agrees with the Commissioner.

## III. Evaluation of Dr. Lear's and NP Friesen's Opinions

### A.   The Applicable Legal Standard

In accordance with the regulations, the term "acceptable medical source" includes only certain listed professionals: licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists.  20 C.F.R. § 416.913(a).  Nurse practitioners are among another group of health-care providers called "other" medical sources from whom the Commissioner will accept and use evidence showing the severity of a claimant's

impairment(s) and how the impairment(s) affects claimant's ability to work.  Id. § 416.913(d).

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s) including [claimant's] symptoms, diagnosis and prognosis."  Id. § 416.927(a)(2).  Such opinions may not be ignored and, unless a treating source opinion is given controlling weight, all medical opinions will be evaluated by the Commissioner in accordance with factors contained in the regulations.  Id. § 416.927(d); SSR 96-5p, West's Soc. Sec. Reporting Serv., Rulings 123-24 (Supp. 2008).

Those factors are: (1) length of treatment relationship and frequency of examination; (2) nature and extent of treatment relationship, including treatment provided and kind of testing or examination performed; (3) degree opinion is supported by relevant evidence; (4) consistency between opinion and record as a whole; (5) whether or not physician is a specialist in the area upon which opinion is rendered; and (6) other factors which tend to support or contradict the opinion.  20 C.F.R. § 416.927(d)(2-6); see also Watkins v. Barnhart, 350 F.3d 1297, 1301 (10th Cir. 2003); Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001); Goatcher v. Dep't of Health & Human Servs., 52 F.3d 288, 290 (10th Cir. 1995).

-7-

A physician who has treated a patient frequently over an extended period of time (a treating source)[1] is expected to have greater insight into the patient's medical condition. <u>Doyal v. Barnhart</u>, 331 F.3d 758, 762 (10th Cir. 2003). But, "the opinion of an examining physician [(a nontreating source)][1] who only saw the claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion." <u>Id.</u> at 763 (citing <u>Reid v. Chater</u>, 71 F.3d 372, 374 (10th Cir. 1995)). However, opinions of nontreating sources are generally given more weight than the opinions of nonexamining sources[1] who have merely reviewed the medical record. <u>Robinson v. Barnhart</u>, 366 F.3d 1078, 1084 (10th Cir. 2004); <u>Talbot v. Heckler</u>, 814 F.2d 1456, 1463 (10th Cir. 1987) (citing <u>Broadbent v. Harris</u>, 698 F.2d 407, 412 (10th Cir. 1983), <u>Whitney v. Schweiker</u>, 695 F.2d 784, 789 (7th Cir. 1982), and <u>Wier ex rel. Wier v. Heckler</u>, 734 F.2d 955, 963 (3d Cir. 1984)).

_____

[1]The regulations define three types of "acceptable medical sources:"

"Treating source:" a medical source who has provided the claimant with medical treatment or evaluation in an ongoing treatment relationship. 20 C.F.R. § 416.902. Generally an "ongoing treatment relationship" will be found "when the medical evidence establishes that [the claimant] see[s], or ha[s] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." <u>Id.</u>

"Nontreating source:" a medical source who has examined the claimant, but never had a treatment relationship. <u>Id.</u>

"Nonexamining source:" a medical source who has not examined the claimant, but provides a medical opinion. <u>Id.</u>

Recognizing the reality that an increasing number of claimants have their medical care provided by health care providers who are not "acceptable medical sources"--nurse practitioners, physician's assistants, social workers, and therapists--the Commissioner promulgated SSR 06-3p.  West's Soc. Sec. Reporting Serv., Rulings 327-34 (Supp. 2008).  In that ruling, the Commissioner noted:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," . . . have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists.  Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

Id. Rulings, 330-31.

Applying the regulations, a nurse practitioner is an "other" medical source, not an "acceptable medical source" or a "treating source."  Id. Rulings, 332.  A nurse practitioner's opinion is not, strictly speaking, a "medical opinion," and is never entitled to controlling weight.  Id. Rulings, 329.  SSR 06-3p explains that opinions of "other" medical sources will be evaluated using the regulatory factors for evaluating medical opinions.  Id. at 331-32(citing 20 C.F.R. §§ 404.1527, 416.927).  In the Ruling, the Commissioner recognizes that "depending on the particular facts in a case, and after applying the factors for

-9-

weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source." Id. at 332.  The Ruling explains that the ALJ "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the . . . decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." Id. at 333; see also Frantz v. Astrue, 509 F.3d 1299, 1302 (10th Cir. 2007)(remanding for consideration of a nurse practitioner's opinions in light of SSR 06-3p).

**B.**   **The ALJ's Findings**

The ALJ discussed the opinions of Dr. Lear and NP Friesen, and decided not to give them substantial weight:

> Rex Lear, M.D., and Sara J. Friesen, ARNP, cosigned statements reporting that the claimant's mental disorders impose marked limitations in many areas of mental functioning and are disabling without being exacerbated by drug or alcohol abuse (exhibit 15F)[(R. 532-36)].  Ms. Friesen also faxed a letter to the claimant's parole officer that the claimant was not able to work (exhibit 14F/258)[(R. 528)].  Although Dr. Lear signed both forms, Comcare treatment notes do not show that he has ever seen the claimant.  Therefore, he is not a treating source.  The claimant has been seen for medication management by Ms. Friesen on a monthly basis since June, 2007 (exhibit 14F)[(R. 515-31)].
>
> The regulations at 20 CFR 416.913(a) list acceptable medical sources whose opinions must be given controlling weight if they are well supported and consistent with the totality of evidence.  As a nurse

-10-

practitioner, Ms. Friesen is not an acceptable medical source.  Her opinion regarding marked limitations is contradicted by the assigned GAF[2] scores of 52 and 55 (exhibit 15F/252)[3], which represent only moderate limitations.  Ms. Friesen described the claimant as alert and cooperative with clean appearance and no abnormal movements or psychomotor agitation or retardation.  The claimant's speech was within normal limits, her affect was congruent and full, and she was fully oriented with intact memory, attention, and concentration.  Thought form was linear and logical. The claimant denied suicidal or homicidal ideation, paranoid delusions, impulsivity, and obsessions, although she had jealous delusions regarding her boyfriend.  She denied hallucinations.  Cognitive functions appeared to be at baseline with existing deficits and insight and judgment were fair (exhibit

---

[2]The court notes that GAF stands for Global Assessment of Functioning.  A GAF score is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning."  Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) 30 (4th ed. 1994).  The GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). Id. at 32.  GAF is a classification system providing objective evidence of a degree of mental impairment.  Birnell v. Apfel, 45 F. Supp. 2d 826, 835-36 (D. Kan. 1999)(citing Schmidt v. Callahan, 995 F. Supp. 869, 886, n.13 (N.D. Ill. 1998)).

A GAF score in the range of 41-50 indicates "**Serious symptoms . . . OR any serious impairment in social, occupational, or school functioning**."  DSM-IV, at 32(emphasis in original).

A GAF score in the range of 51-60 indicates "**Moderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning**." Id.(emphasis in original).

[3]The individual page numbers cited by the ALJ in the decision refer to the Bates-numbered pages in the "F" section of the administrative record.  However, page number 252 is in Exhibit 13F (R. 494), and refers to a "Current" GAF score of 70 and a GAF score "On Admission" of 55.  (R. 494).  Exhibit 15F consists of the statements of Dr. Lear and NP Friesen, and on page number 275 shows "AXIS V" GAF scores of "55 on admission," and "52 current."  (R. 533).  The court finds the ALJ here intended to cite to "Exhibit 15F/275."

-11-

14F)][(R. 515-31)].  Ms. Friesen's opinion has not been
given substantial weight as it is not supported by her
documented findings or by a longstanding treatment
history.  Dr. Lear's opinion has not been given
substantial weight as he is not a treating source and
has not submitted any records to support his opinion.

(R. 24)(citations to the administrative record added).

   **C.**   **Analysis**

     Plaintiff's first claim of error is that ComCare, the entity

with whom Dr. Lear and NP Friesen practice, in this case used a

team approach to mental health treatment.  She argues that Dr.

Lear and NP Friesen are a part of the team treating plaintiff,

and together constitute a treating source.  Therefore, in

plaintiff's view, because the ALJ recognized an internal

inconsistency within Dr. Lear's and NP Friesen's reports he was

required (but failed) to recontact the treating source.  And, the

ALJ improperly ignored certain evidence in evaluating Dr. Lear's

and NP Freisen's reports.  (Pl. Br. 12-16).  The Commissioner

disagrees with each point of plaintiff's argument, asserts that

the ALJ properly weighed the opinions, and argues that

substantial evidence in the record supports the ALJ's

determination.  (Comm'r Br. 4-12).

     Despite the ALJ's finding that Dr. Lear is not a treating

source and NP Friesen is not an acceptable medical source (and by

necessary implication not a treating source), plaintiff argues

that they together constitute a treating source because they are

part of the treatment team (consisting of Dr. Lear, NP Friesen,

-12-

Dr. Shaikh, Dr. Williamson, and a social worker, Hem Sharma)
utilized by ComCare in plaintiff's mental health treatment.  (Pl.
Br. 12)(citing <u>Kingsbury v. Astrue</u>, 2008 U.S. Dist. LEXIS 91008,
*28-29 (D. Kan. 2008); and <u>Shontos v. Barnhart</u>, 328 F.3d 418, 426
(8th Cir. 2003)).  As plaintiff argues, there is case law
indicating that a treatment team may be considered a treating
source when a team approach to treatment has been utilized in a
particular case.  <u>Shontos</u>, 328 F.3d at 426; <u>Gomez v. Chater</u>, 74
F.3d 967, 971 (9th Cir. 1996);[4] <u>Giese v. Barnhart</u>, No. 01-17196,
55 Fed. Appx. 799, 800-01 (9th Cir. Dec. 19, 2002) <u>Nichols v.
Comm'r of Soc. Sec. Admin.</u>, 260 F. Supp. 2d 1057, 1065 (D. Kan.
2003)(relying on <u>Gomez</u>); <u>Metivier v. Barnhart</u>, 282 F. Supp. 2d
1220, 1226-27 (D. Kan. 2003); <u>Kingsbury</u>, 2008 U.S. Dist LEXIS
91008, at *28-29; <u>Colson v. Barnhart</u>, No. 02-108-B, 2003 WL
1092745, *2-3 (D. Me. Mar. 13, 2003).

What is missing here, however, is evidence showing that
ComCare used a team approach to plaintiff's mental health

------

[4]When <u>Gomez</u> was decided, the regulations contemplated that
under Title XVI a report of an "interdisciplinary team" might
constitute an "acceptable medical source."  <u>Compare</u>, 20 C.F.R.
§ 416.913(a)(6) (1996)("interdisciplinary team"); <u>with</u>
§ 404.1513(a) (1996)("interdisciplinary team" not included).  In
the current regulations, the only specific mention that the
report of a treating team is considered acceptable medical
evidence occurs in Part B of the Listing of Impairments, 20
C.F.R., Pt. 404, Subpt. P, App. 1, § 112.00(D)(3), where the
regulations note that for infants and toddlers in programs of
early intervention, "A report of an interdisciplinary team that
contains the evaluation and signature of an acceptable medical
source is considered acceptable medical evidence."

treatment, that Dr. Lear was a part of the team, or that the
opinions presented to the ALJ represent the opinions of the team.
In Shontos, the court found that "Substantial evidence indicates
that the Gannon Center provided a team approach to mental health
care." 328 F.3d at 426. The court in Kingsbury found,
"Substantial evidence indicates that the Guidance Center provided
a team approach to plaintiff's mental health care." 2008 U.S.
Dist. LEXIS 91008 at *28. In Gomez, the court noted that Dr.
Kincade, claimant's family physician, and his nurse practitioner,
Blaker, treated plaintiff from 1986 through 1992. 74 F.3d at
969. It found that although Dr. Kincade had not personally
examined claimant after July, 1990, NP Blaker's opinion was
properly considered as part of the treating source opinion of Dr.
Kincade because NP Blaker consulted with Dr. Kincade numerous
times over the course of the treatment relationship, she worked
closely under the supervision of Dr. Kincade, and she was acting
as an agent of Dr. Kincade.  Id. at 971.

On the other hand, in Giese, the court found the "other"
medical source was not a part of a treatment team where the
supervising physician never treated the claimant or signed off on
the findings of the "other" medical source. 55 Fed. Appx. at
801. In Nichols, although the supervising physician had signed
the "other" medical source's opinion, the court declined to
consider them a team because there was no evidence the "other"

medical source was working closely under the physician's supervision, or had consulted with the physician during treatment of the claimant, and the record did not indicate the physician had treated the claimant or evaluated claimant's condition other than a mere signature on the report.  260 F. Supp. 2d at 1066. In <u>Metivier</u>, the court declined to find a treatment team, and therefore a treating source opinion, because there was no evidence of a close working relationship or active supervision between the physician and the "other" medical source, and only one mention of the physician in the treatment record.  282 F. Supp. 2d at 1226-27.  Finally, in <u>Colson</u>, the court refused to consider the nurse practitioner's opinion as a treating source opinion because "there is no indication in the nurse practitioner's records that she was working other than on her own in her treatment of the plaintiff."  2003 WL 1092745, at *3.

The court finds this case is more like the facts in <u>Giese</u>, <u>Nichols</u>, <u>Metivier</u>, and <u>Colson</u>, than the facts in <u>Shontos</u>, <u>Kingsbury</u>, and <u>Gomez</u>.  Here, plaintiff points to no record evidence that Dr. Lear ever treated or examined plaintiff;[5] or that he consulted with NP Friesen or any of the other health care providers who treated plaintiff; or that NP Friesen was working

---

[5]The record does contain an "Intake Summary" completed by Hem Sharma, LMSW, on November 27, 2006, and reviewed and cosigned by Dr. Lear more than one month later on January 8, 2007.  (R. 510-14).

-15-

closely under the supervision of Dr. Lear.  The only record evidence of any connection whatsoever between Dr. Lear and NP Friesen is that they both signed the medical source statements presented to the ALJ.  As in Nichols, the record does not indicate Dr. Lear had ever treated plaintiff or made any actual evaluation of claimant's condition other than a mere signature on certain reports.  Similar to the facts in Metivier, although Dr. Lear is presumably NP Friesen's supervising physician, there is no record evidence establishing that fact, and there is no evidence of a close working relationship or active supervision between Dr. Lear and NP Friesen.  Like the facts of Metivier, there is one tangential mention of Dr. Lear in the treatment record here.  Finally, other than the fact that NP Friesen and the other members of the alleged treatment team provided treatment to plaintiff at ComCare, plaintiff points to no record evidence that they were actively consulting or collaborating as a team in the treatment or evaluation of plaintiff, and there is no evidence that the opinions expressed in the medical source statements presented to the ALJ are the opinions of the "team." The court cannot find a treatment team, or that the medical source statements signed by Dr. Lear and NP Friesen are the opinions of a "treating source."

The Commissioner argues, in part, that no duty to recontact Dr. Lear or NP Friesen arose because they are not a "treating

source." (Comm'r Br. 11-12).  In her reply brief, plaintiff
acknowledges that the "primary question remaining [in determining
whether a duty to recontact is triggered] is whether the joint
treatment provided by Dr. Lear and ARNP Friesen qualifies them as
a treating source."  (Reply, 2).  As discussed above, Dr. Lear
and NP Friesen do not qualify as a "treating source," either
individually or as a treatment team.  Dr. Lear did not have an
ongoing treatment relationship with plaintiff, NP Friesen is not
an "acceptable medical source" and therefore cannot be a
"treating source," and the record evidence cannot support a
finding that they were part of a treating team.  Therefore, the
ALJ had no duty to recontact Dr. Lear or NP Friesen.

        The ALJ rejected Dr. Lear's opinion because Dr. Lear was not
a treating source, and because Dr. Lear submitted no treatment
records to support his opinion.  (R. 24).  Substantial evidence
in the record supports that determination.  As discussed above,
plaintiff points to no evidence that Dr. Lear ever treated or
examined plaintiff, and there are no records provided by Dr. Lear
to support his opinion.  Plaintiff argues that Dr. Lear is a
psychiatrist who supervises the care provided by NP Friesen and
provides prescriptions for medication, and although he only plays
a background role in plaintiff's mental health treatment, he
"still meets the patient 'with a frequency consistent with
accepted medical practice' for an individual with Ceballos'

condition," and is therefore a treating source with an ongoing treatment relationship in accordance with the regulations. (Reply, 2-3)(quoting 20 C.F.R. § 404.1502).[6]  As discussed above, plaintiff's argument must fail because plaintiff failed in her burden to present evidence in the record which might establish that:  (1) Dr. Lear is a psychiatrist, (2) who supervises NP Friesen in general, (3) who supervised the treatment of, or provided prescriptions for, plaintiff in this case in particular, and (4) who played any role (background or otherwise) in plaintiff's mental health treatment.  It was not error to reject Dr. Lear's opinion.

Plaintiff claims that the ALJ "picked and chose" among the evidence to support his decision to reject NP Friesen's opinion, and improperly failed to discuss evidence supportive of NP Friesen's opinion.  (Pl. Br. 16).  Plaintiff claims it was error for the ALJ to fail to specifically mention portions of NP Friesen's treatment notes including:  plaintiff's report of a belief that people are talking behind her back; NP Friesen's comment "that symptoms continued despite Ceballos' compliance

_____

[6]Although the regulation quoted by plaintiff relates only to disability evaluation pursuant to Title II; 20 C.F.R. § 404.1501; it is identical in every relevant respect to 20 C.F.R. § 416.902 which applies in this Title XVI case; 20 C.F.R. § 416.901; and which defines a "treating source" with an "ongoing treatment relationship."  See, n.1 at p.8 supra.

-18-

with her medication dosing;"[7] plaintiff's report of suicidal

ideation and self-injurious behaviors,[8] including thinking of

jumping off a bridge and asking someone to shoot her; and NP

Friesen's reported GAF score of 50 assigned on June 25 and July

23, 2007.  (Pl. Br. 16).

Herein, the court quoted the ALJ's complete evaluation and

weighing of Dr. Lear's and NP Friesen's opinions.  Supra, at 10-

12.  However, elsewhere in his decision the ALJ gave additional

summary of the treatment provided by ComCare.  (R. 17, 18, 19,

22).  He noted plaintiff had begun treatment with ComCare on

November 27, 2006, at which point she was homeless with two

children age five and age one, and denied cocaine use but

reported intermittent marijuana use.  (R. 17).  He stated that

ComCare therapists noted appropriate thought content, no

hallucinations, and improved concentration and attention with

treatment but with lack of persistence.  (R. 18).  He then

concluded that plaintiff had "moderate difficulty maintaining

concentration, persistence, or pace."  (R. 19).

---

[7]The record cited by plaintiff does not support her
assertion.  The record notes that plaintiff "stated she has been
compliant with her medication dosing," but it says nothing about
symptoms continuing.  (R. 517).  Moreover, plaintiff's brief does
not identify the specific symptoms which she alleges continued
despite compliance with medication dosing.

[8]Plaintiff misconstrues the record evidence in this regard.
The treatment note cited by plaintiff states, "Patient denies
. . . self-injurious behaviors," and "Patient endorses suicidal
ideation and self-injurious thoughts."  (R. 526)(emphases added).

The ALJ specifically discussed the GAF scores contained in the record.  He noted GAF scores of 35 and of 45 assigned at Valeo Behavioral Health Care.  (R. 19).  He summarized the GAF scores assigned in treatment at ComCare:  "The claimant was assigned a GAF of 55 when beginning therapy at Comcare.  Her GAF had improved to 70 by December 8, 2006, and subsequently varied from 40 on May 23, 2007, immediately after prison discharge, to 60 on June 13, 2007."  Id.

The ALJ also discussed certain relevant facts from the ComCare treatment records when he discussed the credibility of plaintiff's allegations of disabling symptoms.  (R. 22).

The court finds no error in the ALJ's summary of the ComCare treatment records in general, and NP Friesen's treatment records in particular.  The ALJ's summary is a fair and accurate summary of the evidence.  Plaintiff's claim that the ALJ ignored NP Friesen's assignment of GAF scores of 50 on two occasions is not supported by the record.  As quoted above, the ALJ noted that after plaintiff's GAF improved to 70 on December 8, 2006, it varied between a low of 40 which occurred on May 23, 2007 after a period in prison, and a high of 60 which occurred on June 13, 2007.  The record supports the ALJ's findings, and although the ALJ did not specifically mention the GAF scores of 50 assigned by NP Friesen, those scores are included within the variation between 40 and 60 occurring after December 8, 2006 as summarized

-20-

by the ALJ.  Contrary to plaintiff's assertion, these facts do
not indicate that the ALJ ignored the GAF scores assigned by NP
Friesen.

The court finds no error in the ALJ's failure to mention the
other facts cited by plaintiff.  An ALJ need not discuss every
piece of evidence.  He must discuss evidence supporting his
decision, uncontroverted evidence he chooses not to rely upon,
and significantly probative evidence he rejects.  Clifton v.
Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996); Grogan v.
Barnhart, 399 F.3d 1257, 1266 (10th Cir. 2005).  Plaintiff merely
cites to the evidence allegedly ignored by the ALJ and makes no
attempt to establish that the evidence is either significantly
probative or uncontroverted.  The court finds it is not, finds
that plaintiff has misconstrued the evidence (see nn. 7&8 above)
and finds no error in the ALJ's failure to specifically address
that evidence.

The court will address one issue implied but not
specifically argued in plaintiff's brief.  In her brief,
plaintiff quotes the ALJ's summary of NP Friesen's treatment
records in which the ALJ noted the record revealed that "claimant
denied suicidal . . . ideation."  (Pl. Br. 15).  Then, plaintiff
asserts that the ALJ improperly ignored the treatment note which
stated that plaintiff reported suicidal ideation.  (Pl. Br.
16)(citing (R. 526)).  As discussed above, plaintiff argued in

-21-

her brief that the ALJ ignored plaintiff's report of suicidal
ideation, but she did not argue that the ALJ's finding that
plaintiff denied suicidal ideation was erroneous.  Nonetheless,
out of an abundance of caution, the court addresses the implied
error.  The court finds that any error, if it exists, is
harmless.

Although the harmless error statute, 28 U.S.C. § 2111, is
not strictly applicable to judicial review of an administrative
decision, courts have applied it to cases in which remand would
be merely a waste of time and money.  Kerner v. Celebrezze, 340
F.2d 736, 740 (2d Cir. 1965) (no reason the rule should not be
applied in judicial review of an administrative decision); see
also, Bernal v. Bowen, 851 F.2d 297, 302 (10th Cir. 1988)
(harmless error for ALJ rather than psychologist to fill out
PRTF).  The Tenth Circuit has also held that where there is
substantial evidence to sustain the ALJ's decision despite an
error, the error is harmless, and the court will not remand
merely for a ministerial correction.  Wilson v. Sullivan, No. 90-
5061, 1991 WL 35284, *2 (10th Cir. Feb. 28, 1991).

However, as the court warned in Allen, 357 F.3d at 1145, two
considerations counsel a cautious application of the harmless
error rule to a dispositive finding of fact.

> First, if too liberally embraced, [the harmless error
> rule] could obscure the important institutional
> boundary preserved by Drapeau's admonition that courts
> avoid usurping the administrative tribunal's

responsibility to find the facts.  Second, to the
extent a harmless-error determination rests on legal or
evidentiary matters not considered by the ALJ, it risks
violating the general rule against post hoc
justification of administrative action recognized in
SEC v. Chenery Corp., 318 U.S. 80, 63 S. Ct. 454, 87 L.
Ed. 626 (1943) and its progeny.  With these caveats, it
nevertheless may be appropriate to supply a missing
dispositive finding under the rubric of harmless error
in the right exceptional circumstance, i.e., where,
based on material the ALJ did at least consider (just
not properly), we could confidently say that no
reasonable administrative factfinder, following the
correct analysis, could have resolved the factual
matter in any other way.

Id.

The ComCare treatment records reveal that NP Friesen

performed a "medication review" and produced a "Medication

Management Document" regarding plaintiff on June 25, 2007 and on

July 23, 2007.  (R. 515-20, 523-28).  At the June 25 visit, NP

Friesen noted plaintiff's "Symptoms" in the section of the

treatment record entitled "Reason for Treatment/Interim History:"

> Suicidal Ideation:  She admits to having occasional
> thoughts of jumping off a building or to pay someone to
> shoot me" [sic] She stated that she has never made an
> attempt to end her life through suicide.  She denied
> any current plan or intent to harm herself.
> Homicidal Ideation:  She denies any thoughts, intent or
> plan to harm others.

(R. 523-24).  She also recorded a "Mental Status Exam:"

> Patient denies homicidal ideation, self-injurious
> behaviors, paranoid delusions, impulsivity and
> obsessions/compulsions.

> Patient endorses suicidal ideation and self-injurious
> thoughts.

> Suicidal ideation included Thoughts [sic] of jumping
> off a bridge and/or asking someone to shoot her, but
> denies plan or intent.

(R. 526).

On July 23, the duration of the visit was shorter, at twenty

minutes, and NP Friesen did not include any notes regarding

suicidal ideation or homicidal ideation in the section entitled

"Reason for Treatment/Interim History."  (R. 516).  She did make

such observations in the section entitled "Mental Status Exam:"

> Patient denies suicidal ideation, homicidal ideation,
> self-injurious thoughts, self-injurious behaviors,
> paranoid delusions, impulsivity and
> obsessions/compulsions.

(R. 518).

The ComCare records include "Mental Status Exams" with

language identical to the July 23 evaluation, which were

completed by Dr. Shaikh on January 10, January 24, February 21,

May 27, and June 13, 2007; and by Dr. Williamson on December 22,

2006.  (R. 493, 496, 498, 501, 504, 529).  In addition, Dr.

Williamson performed a medication evaluation on December 8, 2006

in which she stated, "Thought content/perceptions without

delusions, hallucinations, obsessions, suicidality or

homicidality."  (R. 508).

Here, it is clear that the ALJ considered the ComCare

treatment records, including the records of NP Friesen.

Moreover, in the face of the overwhelming evidence that suicidal

ideation or thoughts of self-harm are recorded on only one

occasion in the treatment records and specifically deny plan or intent, no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way than to find that plaintiff denied suicidal ideation. Any potential error in summarizing NP Friesen's ComCare records was harmless.

In her final allegation of error, plaintiff claims the ALJ failed to properly evaluate NP Friesen's opinion in accordance with SSR 06-3p.  Specifically, she argues that the ALJ failed to consider that NP Friesen is an "other" medical source (Pl. Br. 17), and implies that he cursorily dismissed NP Friesen's opinion and records with "minimal discussion and disregard for [the] opinion." (Pl. Br. 20).  The Commissioner argues that the ALJ properly weighed NP Friesen's opinion and properly applied the Ruling.

The court quoted the ALJ's complete evaluation and weighing of NP Friesen's opinion.  Supra, at 10-12.  The ALJ also specifically noted the legal standard applicable to his RFC assessment, and stated that he "considered opinion evidence in accordance with the requirements of 20 CFR 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p."  (R. 20)(emphasis added).

The court previously summarized the standard presented in SSR 06-3p, and will not repeat it here.  Plaintiff points to no record evidence and nothing from the decision to support her

claim that the ALJ failed to consider NP Friesen is an "other" medical source.  She does not even recognize that the ALJ cited SSR 06-3p in the decision.  The court will usually "take a lower tribunal at its word when it declares that it has considered a matter."  Hackett, 395 F.3d at 1173.  Therefore, lacking any evidentiary suggestion to the contrary, the court will take the ALJ's word that he considered opinion evidence in accordance with SSR 06-3p.  Moreover, NP Friesen's opinion was evaluated in the same section of the decision in which the ALJ evaluated the medical opinions, and reveals that the same factors were considered with regard to NP Friesen's opinion as were considered with regard to the opinions of the "acceptable medical sources." (R. 23-25).

The court has identified several reasons given in the decision for discounting NP Friesen's opinion:  NP Friesen is not an "acceptable medical source," her opinion that plaintiff had numerous (ten out of twenty) marked limitations is inconsistent with the GAF scores she assigned, her opinion is not supported by her documented findings, and she had only treated plaintiff monthly between June and September, 2007.  (R. 24).  These are the same kinds of regulatory factors used to evaluate medical opinions, indicating the ALJ applied the regulatory factors to evaluating NP Friesen's "other" medical source opinion, as is

required by SSR 06-3p.  Each of the reasons given is supported by record evidence.

Although plaintiff argues the fact NP Friesen is not an acceptable medical source should not be used to discount her opinion, the court does not agree.  As SSR 06-3p cautions, "The fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source' because, . . . 'acceptable medical sources' 'are the most qualified health care professionals.'" West's Soc. Sec. Reporting Serv., Rulings 332 (Supp. 2008)(quoting 65 Fed. Reg 34955 (June 1, 2000)).  This is precisely what happened here, Dr. Allen and Dr. Witt, "acceptable medical sources," stated opinions contrary to NP Friesen's, and the ALJ credited their opinions over that of NP Friesen for the reasons given in the decision, including the fact that NP Friesen is not an "acceptable medical source."  The court finds the ALJ properly applied SSR 06-3p in weighing NP Friesen's opinion.

The court has considered each of plaintiff's arguments, and finds the ALJ properly weighed the opinions of Dr. Lear and NP Friesen.  Plaintiff has not shown error in the ALJ's decision.

**IT IS THEREFORE RECOMMENDED** that judgment be entered in accordance with the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's decision.

Copies of this recommendation and report shall be delivered to counsel of record for the parties. Pursuant to 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b), and D. Kan. Rule 72.1.4, the parties may serve and file written objections to this recommendation within ten days after being served with a copy. Failure to timely file objections with the court will be deemed a waiver of appellate review. <u>Morales-Fernandez v. INS</u>, 418 F.3d 1116, 1119 (10th Cir. 2005).

Dated this <u>14th</u> day of July 2009, at Wichita, Kansas.


<u>s:/Gerald B. Cohn</u>
**GERALD B. COHN**
**United States Magistrate Judge**